PER CURIAM.[1]
Hornady Transportation, LLC (“Horna-dy”), appeals from a judgment of the Monroe Circuit Court awarding workers’ compensation death benefits and the cost of funeral expenses to Gwendolyn B. Fluellen and Matkoski Fluellen (hereinafter referred to collectively as the “dependents”), the widow and son of Hornady’s deceased employee, Charles Fluellen (“Fluellen”).
The record indicates the following. On September 28, 2009, Hornady filed a complaint for declaratory relief, seeking a determination of its rights and responsibilities under the Alabama Workers’ Compensation Act, Ala.Code 1975, § 25-5-1 et seq. (“the Act”), following the death of Fluellen. Gwendolyn Fluellen (“the widow”) answered and counterclaimed, seeking benefits under the Act for herself and Matkoski Fluellen (“the son”). Following lengthy discovery, the case was tried on November 17, 2010. Aside from the widow’s testimony, there was no live testimony presented; the case was submitted to the trial court upon the stipulations of the parties, the widow’s testimony, the deposition testimony of other witnesses, and other documentary evidence. We note, however, that the depositions were recorded and that compact discs containing recordings of the depositions were admitted into evidence.
The parties stipulated that Fluellen was driving an 18-wheel tractor-trailer truck for Hornady when he was involved in a single-vehicle collision in North Carolina; that the widow and the son were Fluellen’s *238 dependents as defined in the Act; and that, if the trial court determined that the claim was compensable, Fluellen’s dependents would be entitled to 66.667% of his average weekly wage of $722.70 so long as they continued to be his dependents or for a period not exceeding 500 weeks, whichever period was shorter.
The evidence in the record tended to show the following. The accident occurred on Sunday, May 4, 2008, at approximately 9:20 a.m. It was undisputed that Fluellen had not worked for the previous two days and that he had begun driving at 6:00 a.m. that day. The only eyewitness account of the crash presented at trial was contained in the deposition testimony of Michael Wade. On the day in question, Wade was traveling in the left northbound lane of Interstate 95, near Lumberton, North Carolina. Wade, a staff sergeant in the United States Army who served in the wars in both Iraq and Afghanistan, testified by deposition that “heavy winds” were blowing the morning of Fluellen’s accident. In describing the accident, Wade said that he was traveling in the passing lane of Interstate 95 in North Carolina, that he had just passed an automobile, and that he was preparing to pass the tractor-trailer driven by Fluellen when Fluellen changed lanes in front of him. Wade said that he did not remember whether Fluellen signaled for a lane change but that it appeared to him that the change was “preplanned.” Wade said that he had space ahead of him, so he slowed slightly and changed into the right-hand lane. Wade said that as he passed the tractor-trailer on the right side, he noticed that it was maintaining the same speed. As he drew parallel with the tractor-trailer, Wade said, he noticed in his peripheral vision that it was “getting further and further away from him” and that, as he drew even with the cab of the truck, he looked over and saw that the “entire truck [was] off the interstate into the grassy median and impacted] a tree.” He said that just before the impact, he turned to look at the road but that he saw, felt, and heard an explosion. He said that he pulled his vehicle off to the right side of the road and saw that the tractor-trailer, including the cab of the truck, was “completely engulfed in flames.”
Wade testified that he exited his vehicle, crossed the interstate, and then sprinted toward the tractor-trailer. As he approached, he said, there was a second explosion. The cab of the truck was completely split open, Wade said, and therefore he was able to see that the second explosion occurred behind the cab, on the passenger side of the truck. He said that the second explosion “just added to the flames therefore it wasn’t significant to him.”
When Wade reached the cab, he said, Fluellen was still strapped in his seatbelt, but the seat, with Fluellen in it, had been ejected from the cab and was sitting on debris just below Wade’s eye level. Wade testified that, if not for the heat from the flames, he could have reached Fluellen to unbuckle him and pull him from the seat. However, Wade said, the heat was “unbearable” and he was not able to move any closer to Fluellen. Nonetheless, Wade attempted to remove debris off Fluellen. Because of the heat, Wade said, he ran in, moved debris, and ran back out again. Wade attempted to reach Fluellen three times, but because of the flames, he said, he “just couldn’t get to him.” He said that the debris was on fire, Fluellen’s seat was on fire, and the cab was on fire.
Wade testified that he kept making attempts to reach Fluellen, who was completely covered in flames, because he saw Fluellen moving and believed that he was alive. He said that Fluellen was making slow movements with his arms. He de *239 scribed the movements, saying: “It looked like an attempt to free himself or to move from the area he was in. His head and his arms were slowly moving in an upward motion.” He also said that Fluellen’s body was moving in the direction toward where Wade was standing. Wade said that, after he attempted to reach Fluellen the third time, he noticed that Fluellen had stopped moving and that his body went limp. When there was no longer any effort on Fluellen’s part, Wade said, he believed that that was when Fluellen had died. Wade did not make any other attempt to approach Fluellen.
Soon thereafter, law-enforcement officers, firefighters, and emergency medical technicians arrived on the scene. In deposition testimony, Lumberton police officer John Lynch stated that he arrived at the crash site at 9:27 a.m. and performed an investigation. He identified two witnesses, Wade and Jason Covey, who had previously given statements to a state trooper, and he appended those statements to his crash report. Covey stated: “At 9:20 a.m. on 5-4-08, I witnessed a tractor-trailer go off the road into the median. The truck caught fire immediately [after it hit a tree].” According to the report, Wade told Officer Lynch:
“Victim was traveling northbound in passing lane at mile marker 11 north of exit 10. Victim gradually moved towards the median at maintained speed and struck tree and vehicle exploded on impact. Victim was still alive slightly and some movement. Victim was trapped under seat but [I] was unable to release him and pull from wreckage.”
Officer Lynch testified that the highway was straight and level at the site where the tractor-trailer had left the road and that the weather that day had been clear and sunny. Officer Lynch measured the distance that the tractor-trailer had traveled in the median before it struck the tree as 408 feet; he saw no skid marks on the highway, no sign of braking in the grassy median, and no evidence indicating that Fluellen had attempted to veer the tractor-trailer back onto the roadway.
Paramedic Wadius Williams arrived on the scene at 9:43 a.m. and was not allowed to approach the wreckage until the firefighters extinguished the fire an hour later. While he was waiting for the fire to be extinguished, Williams spoke to bystanders who had gathered and asked whether anyone had witnessed the crash. Two unidentified bystanders (a 40- to 50-year-old man and a woman for whom Williams provided no description) responded. The man told Williams that “ ‘they’ had tried to pull [Fluellen] from the burning cab but the flames got up, forcing them back.” The evidence in the record indicates that a female witness at the scene, who was never identified otherwise, told Williams that, when she saw him, Fluellen, “looked confused, as if he had hit his head during the impact.” The female witness also told Williams that Fluellen was “moving some” after the accident. When asked about the female witness’s statement that Fluellen appeared to be confused, Wade said that he could not confirm her statement because he had not been able to see Fluellen’s face, which had been covered by flames. However, he did say that Fluellen had appeared to be in shock and to be making an effort to free himself.
Dr. Cynthia Gardner, a board-certified forensic pathologist, performed an autopsy on Fluellen’s body. Dr. Gardner testified by deposition that Fluellen’s body had been charred on 100% of its surface area. Dr. Gardner concluded, however, that Fluellen had not been alive when his body was burned in the fire. She based that conclusion on several findings. First, she noted the absence of soot in Fluellen’s *240 trachea, esophagus, and bronchi, explaining that if a person is breathing during a fire, his or her airways will normally be lined with a gray, sooty residue. Next, she said, when a person breathes in smoke, his or her blood cells attach to carbon-monoxide molecules in the smoke rather than to oxygen: she also stated that victims of smoke inhalation have very high levels of aortic-blood carbon-monoxide saturation. Fluellen’s saturation level, however, was less than 5%, an amount that Dr. Gardner characterized as inconsequential. Finally, Dr. Gardner determined that Fluellen had severe coronary-artery atherosclerosis, or hardening of the arteries, as well as scarring on the heart muscle that, she said, was indicative of a previous heart attack. One coronary artery revealed a 50% blockage, and two other coronary arteries revealed blockages of 90% and 95%. Dr. Gardner stated that having a blockage of greater than 75% in any one artery is considered severe and is thought to be sufficient to cause sudden death. Dr. Gardner also stated that Fluellen’s heart, which weighed 470 grams, was “quite enlarged,” indicating, she said, that he had suffered for years from ischemic disease or high blood pressure.
However, Dr. Gardner acknowledged that none of her findings indicated that Fluellen had actually suffered a heart attack while driving. On cross-examination by the dependents’ counsel, Dr. Gardner acknowledged the possibility that something other than a fatal cardiac event before the fire could have accounted for the absence of soot in Fluellen’s airways and the low carbon-monoxide levels in his blood, namely that Fluellen had died in a “flash fire.” Dr. Gardner described a “flash fire” as follows:
“A flash fire [is] ... an explosion, a very hot' fire that happens very suddenly in a small space. And the effect of that is that the person who is alive and breathing in a flash fire inhales very, very hot air which then damages their airway, and it damages it by causing it to swell up, and they basically smother, but it keeps them from getting all the smoke and soot down into their airway. So at the time of the autopsy, you don’t see anything. You don’t see soot lining the airways all the way down, and they don’t have a high carbon-monoxide level because they die very rapidly from the superheated gases that they’ve inhaled.”
Dr. Gardner found that Fluellen had sustained only minimal blunt-trauma injuries in the crash — a fractured upper jaw and a fractured rib — neither of which, she said, was sufficient to cause death. That finding, as well as the absence of any evidence indicating that Fluellen had been breathing at the time of the fire, when combined with the history Dr. Gardner had received concerning the manner in which Fluellen’s tractor-trailer had gradually drifted off the roadway, had traveled in a straight line down the median for more than 400 feet, and had crashed into a tree, warranted the conclusion, according to Dr. Gardner, that the cause of Fluellen’s death was coronary-artery insufficiency due to atherosclerotic cardiovascular disease. A certificate of death reflecting Dr. Gardner’s conclusion was issued in June 2008.
Almost a year later, in the spring of 2009, the widow requested that officials in the North Carolina Chief Medical Examiner’s office reopen the inquiry into the cause of Fluellen’s death and conduct an investigation, based on evidence that, the widow maintained, had not been presented to Dr. Gardner before the preparation of the autopsy report. Dr. Gardner had moved to Louisiana, so the widow’s request was assigned to Dr. Samuel Simmons, also a forensic pathologist in the *241 Chief Medical Examiner’s office. Dr. Simmons obtained Wade’s statement, as well as a report made by Emergency Medical Services (“EMS”) that contained the statements made by two unidentified bystanders to Williams, the paramedic. After reviewing those sources and conferring with his colleagues, Dr. Simmons determined that the additional evidence suggesting that Fluellen had been “moving and/or responsive when [eyewitnesses] arrived on the scene” necessitated an amendment to the autopsy report and the death certificate. The Chief Medical Examiner’s office issued a supplemental report, altering the cause of death to “thermal injuries due to a motor-vehicle incident with fire,” and an amended death certificate.
In her deposition, Dr. Gardner acknowledged that she had not seen the eyewitness accounts of the accident at the time she conducted the autopsy and determined the cause of death. However, she said, those accounts, in which the witnesses said that Fluellen appeared to be moving after the accident, did not establish that he was alive. She stated that the movements described were, in her opinion, of the type she “would expect a burning body to produce normally,” in which the muscles contract into a “pugilistic posture.”
Dr. Gardner also conceded, however, that people may survive a coronary event such as a heart arrhythmia, which cannot be discovered in an autopsy. But, she said, Fluellen would not have survived the flames. Dr. Gardner testified that, if she had known of the witness reports indicating that Fluellen was still alive when the witnesses first reached him, she would have concluded that Fluellen died as the result of thermal injuries.
On March 9, 2011, the trial court entered a judgment determining that Fluel-len’s death arose out of and in the course of his employment with Hornady and that the medical cause of Fluellen’s death was “fatal thermal injury” resulting from the explosion and fire caused by the collision. The court awarded death benefits to the dependents and funeral expenses in the amount of $6,887. Hornady appealed.
Hornady argues that the trial court erred in admitting the EMS report containing statements of the unidentified bystanders because, it says, those statements were hearsay. The dependents contend that Hornady waived that objection by stipulating to the admissibility of the EMS report. In the alternative, they contend that the evidence challenged by Hornady falls within exceptions to the hearsay rule found in Rule 803(2) and 803(4), Ala. R. Evid.
“ ‘ “ ‘The standard applicable to a review of a trial court’s rulings on the admission of evidence is determined by two fundamental principles. The first grants trial judges wide discretion to exclude or to admit evidence.’ ” Mock v. Allen, 783 So.2d 828, 835 (Ala.2000) (quoting Wal-Mart Stores, Inc. v. Thompson, 726 So.2d 651, 655 (Ala.1998)). Despite the latitude afforded the trial court in its evidentiary rulings, a trial court exceeds its discretion where it admits prejudicial evidence that has no probative value. See Powell v. State, 796 So.2d 404, 419 (Ala.Crim.App.1999), aff'd, 796 So.2d 434 (Ala.2001).
“““The second principle “is that a judgment cannot be reversed on appeal for an error [in the improper admission of evidence] unless ... it should appear that the error complained of has probably injuriously affected substantial rights of the parties.” ’ ” Mock, 783 So.2d at 835 (quoting Wal-Mart Stores, 726 So.2d at 655, quoting in turn Atkins v. Lee, 603 So.2d 937, 941 (Ala.1992)). See also Ala. R.App. P. 45. “The burden of establishing that an erroneous *242 ruling was prejudicial is on the appellant.” Preferred Risk Mut. Ins. Co. v. Ryan, 589 So.2d 165, 167 (Ala.1991).’ “Middleton v. Lightfoot, 885 So.2d 111, 113-14 (Ala.2003) (emphasis omitted).”
Wood v. Hayes, 104 So.3d 863, 873 (Ala.2012).
Rule 803(2) provides that “[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition” does not constitute inadmissible hearsay. Likewise, Rule 803(4) provides that “[statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment” do not constitute inadmissible hearsay. The Advisory Committee’s notes regarding Rule 803(4) state that the rule applies not only to statements made to physicians, which had been the law before the adoption of the rules of evidence, but also to statements made to anyone whose participation or involvement is necessary in the process of diagnosis or treatment, including hospital attendants, ambulance drivers, or even members of the family. See also Fed.R.Evid. 803(4), Advisory Committee’s Notes.
Regarding the admissibility of hearsay pursuant to Rule 803(4), the Alabama Court of Criminal Appeals has stated:
“In determining whether a statement comes within this hearsay exception, courts have applied a ‘two-pronged test.’ The first prong ‘is the requirement that the statement must be one upon which medical personnel reasonably rely in diagnosis and treatment. The second prong consists of a requirement that the declarant possess a motive which is consistent with the rule’s underlying purpose ... [of] seeking diagnosis or treatment.’ McElroy’s Alabama Evidence § 261.02(4) (5th ed.1996).”
Biles v. State, 715 So.2d 878, 887 (Ala.Crim.App.1997).
An autopsy is “[a] medical examination of a corpse to determine the cause of death.” Black’s Law Dictionary 154 (9th ed.2009). Thus, when performing an autopsy, medical examiners are essentially “diagnosing” what caused the death of an individual. Our analysis as to whether statements the witnesses made to emergency personnel, including EMS responders, ' does not change because the victim died of injuries sustained in the accident. The circumstances that brought about the death are just as relevant in the performance of an autopsy as they are when physicians are seeking to diagnose or treat the victim.
In McKenna v. St. Joseph Hospital, 557 A.2d 854 (R.I.1989), a case cited favorably in Dean Gamble’s discussion of Rule 803(4) in McElroy’s Alabama Evidence § 261.02(2) (5th ed.1996), the Rhode Island Supreme Court reversed a trial court’s decision to exclude statements that unidentified bystanders had made to rescue personnel, who in turn conveyed those statements to emergency-room personnel. The rescue personnel had responded to a call that a man had jumped from an overpass onto a highway, causing the man’s death. McKenna, 557 A.2d at 856. The unidentified bystanders made statements regarding the man’s behavior just before the incident. In reversing the trial court’s decision to exclude the statements, the Rhode Island Supreme Court explained:
“[T]he bystanders’ statements come within the exception embodied in Rule 803(4). The statements were made by an individual to emergency personnel with no motive to fabricate or lie, describing with particularity a specific situ *243 ation. Also, the remarks were made to emergency personnel attending a call for assistance in order to foster treatment. Therefore, the prerequisites of Rule 803(4) have been met, making the statement[s] admissible hearsay.”
Id. at 858.
In this case, bystanders told Williams, the EMS provider who responded to the accident scene for the purpose of treating the injured, that Fluellen had been alive and attempting to move immediately after the collision. As in McKenna, the bystanders in this case had no reason to lie to Williams when they described what had happened to Fluellen. Therefore, we conclude that the EMS report containing statements of bystanders who witnessed the accident and its immediate aftermath met the requirements of Rule 803(4) and was properly admitted pursuant to that rule.
We note that the trial court admitted the EMS report pursuant to Rule 803(2), the excited-utterances exception to the hearsay rule. Because we have concluded that the report was properly admitted pursuant to Rule 803(4), we need not determine whether it was properly admitted pursuant to Rule 803(2).
“[An appellate court] can affirm a trial court’s judgment for any reason, even one not contemplated by the trial court. See Turner v. Westhampton Court, L.L.C., 903 So.2d 82, 88 (Ala.2004) (‘This Court can affirm a trial court’s judgment for any reason, but only if the record on appeal evidences the fact that is the basis for the affirmance.’ (citing Ex parte Ryals, 773 So.2d 1011, 1013 (Ala.2000))).”
Carroll v. W.L. Petrey Wholesale Co., 941 So.2d 234, 240 n. 6 (Ala.2006).
Moreover, we note that the witness statements to which Hornady objects tend to indicate that Fluellen was still alive immediately after the accident. Those statements corroborate Wade’s testimony. From the record, it appears that Wade gave the most complete and descriptive statement of the accident and Fluellen’s movements as Wade tried to rescue him. The statements of the unidentified witnesses are cumulative of Wade’s testimony. Therefore, even if admittance of the EMS report had constituted error, that error would probably have not injuriously affected Hornady’s substantial rights. Accordingly, any such error would have been harmless. See Wood v. Hayes, 104 So.3d at 870 and Rule 45, Ala. R.App. P.
Hornady argues that the trial court erred in admitting Dr. Simmons’s opinion testimony, as well as the amended autopsy report and the amended death certificate — all of which, it says, were premised upon the allegedly inadmissible hearsay statements. However, as discussed, the EMS report and witness statements were properly admitted into evidence.
To the extent that Hornady argues that the challenged witness statements were not factually correct because, as Hornady contends, Fluellen was already dead when the tractor-trailer he was driving traveled off the interstate into the median and struck a tree, such a challenge does not render Dr. Simmons’s opinion testimony or documents memorializing his opinion, i.e., the amended autopsy report and the amended death certificate, inadmissible. However, as discussed later in this opinion, the cause of Fluellen’s death was the primary dispute in this action, and it was the duty of the trial court, as the trier of fact, to reconcile the conflicting testimony regarding what caused Fluellen’s death.
In the context of a workers’ compensation case in which the employer had challenged the testimony of two physicians *244 regarding the cause of an employee’s injuries, this court held that
“ ‘[i]t is well settled that any challenge to the facts upon which an expert bases his opinion goes to the weight, rather than the admissibility, of the evidence. Dyer v. Traeger, 357 So.2d 328, 330 (Ala.1978).’ Baker v. Edgar, 472 So.2d 968, 970 (Ala.1985). See also Fort James Operating Co. v. Kirklewski, 893 So.2d 434, 439 (Ala.Civ.App.2004); Independent Life & Accident Ins. Co. v. Harrington, 658 So.2d 892, 898 (Ala.1994); and Alabama Power Co. v. Courtney, 539 So.2d 170, 173 (Ala.1988).”
Millry Mill Co. v. Manuel, 999 So.2d 508, 518 (Ala.Civ.App.2008).
As to the admissibility of the amended autopsy report and the amended death certifícate,
“ ‘[b]oth Alabama and federal case-law have recognized that the business records exception is a firmly rooted exception to the hearsay rule. See, e.g., McNabb v. State, 887 So.2d 929, 969 (Ala.Crim.App.2001); Ohio v. Roberts, 448 U.S. [56] at 66 n. 8, 100 S.Ct. 2531 (1980) ]. Moreover, under Alabama law, “An autopsy report made in the regular course of business is admissible under the business records exception.” 2 Charles W. Gamble, McElroy’s Alabama Evidence § 254.01(18) (5th ed.1996) (footnote omitted). See also Adams v. State, 955 So.2d 1037, 1072-73 (Ala.Crim.App.2003); Baker v. State, 473 So.2d 1127, 1129 (Ala.Crim.App.1984). The results of Dr. Embry’s autopsy and the supporting materials are business records, which bear the earmark of reliability or probability of trustworthiness and further the “ ‘integrity of the fact-finding process,’ ” see Coy v. Iowa, 487 U.S. 1012, 1020, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988) (quoting Kentucky v. Stincer, 482 U.S. 730, 736, 107 S.Ct. 2658, 96 L.Ed.2d 631 (1987))....’
“[Perkins v. State,] 897 So.2d [457] at 463-65 [ (Ala.Crim.App.2004) ]. See Gobble v. State, 104 So.3d 920 (Ala.Crim.App.2010); Sharifi v. State, 993 So.2d 907 (Ala.Crim.App.2008).”
Thompson v. State, [Ms. CR-05-0073, Feb. 17, 2012] — So.3d -, - (Ala.Crim. App.2012).
Based on the record before us, we conclude that the trial court properly allowed Dr. Simmons’s testimony regarding his opinion as to the cause of Fluellen’s death, as well as the amended autopsy report and amended death certificate reflecting that opinion.
Hornady argues that the trial court erred by finding that Fluellen’s death was proximately caused by an accident arising out of and in the course of his employment with Hornady. It contends that “the only legal evidence demonstrates that [Fluel-len’s] death was caused by an idiopathic heart attack which occurred prior to the actual collision.”
In the Act, the legislature set forth the following standard that this court must apply in reviewing workers’ compensation cases.
“(e) Review. From an order or judgment, any aggrieved party may, within 42 days thereafter, appeal to the Court of Civil Appeals and review shall be as in cases reviewed as follows:
“(1) In reviewing the standard of proof set forth herein and other legal issues, review by the Court of Civil Appeals shall be without a presumption of correctness.
“(2) In reviewing pure findings of fact, the finding of the circuit court *245 shall not be reversed if that finding is supported by substantial evidence.”
§ 25-5-81(e), Ala.Code 1975.
“Substantial evidence is ‘ “evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.” ’ Ex parte Trinity Indus., Inc., 680 So.2d 262, 268 (Ala.1996) (quoting West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989)).”
White Tiger Graphics, Inc. v. Clemons, 88 So.3d 908, 910 (Ala.Civ.App.2012).
The decision of the trial court must be based on a preponderance of the evidence. § 25-5-81 (c), Ala.Code 1975. A preponderance of the evidence is defined as
“[t]he greater weight of the evidence, not necessarily established by the greater number of witnesses testifying to a fact but by evidence that has the most convincing force; superior evidentiary weight that, though not sufficient to free the mind wholly from all reasonable doubt, is still sufficient to incline a fair and impartial mind to one side of the issue rather than the other.”
Black’s Law Dictionary 1801 (9th ed.2009).
Hornady’s statement that the only “legal evidence” indicated that Fluellen died of a heart attack before the accident is simply not supported by the record. Both Dr. Gardner and Dr. Simmons testified that they could not say to a reasonable degree of medical certainty that Fluellen had died of a heart attack, or that he had even suffered a heart attack, before the accident happened. Based on the record before us, a determination that Fluellen died of a heart attack would be merely speculative.
Contrary to Hornady’s assertion, there is evidence in the record tending to support the trial court’s judgment. Wade said that as he was preparing to pass Fluellen’s truck, Fluellen changed lanes. Wade testified that his impression was that the lane change was “preplanned,” which would indicate that Fluellen was still conscious at that time.
Wade did not see but felt the first explosion, when the tractor-trailer collided with the tree. He pulled his vehicle off to the shoulder of the interstate, and then ran back toward the accident to assist Fluel-len. The second explosion occurred toward the back of the truck as Wade approached. The cab had already been split open, and Fluellen, still strapped in his seat by his seatbelt, had been ejected from the cab by the time the second explosion occurred. Wade said that he made three attempts to reach Fluellen, but, he said, the heat was “unbearable” and he “just couldn’t get to him.” Wade testified that the reason he kept trying to reach Fluellen was because he saw Fluellen moving and believed that he was alive. Wade described Fluellen’s movements, saying: “It looked like an attempt to free himself or to move from the area he was in. His head and his arms were slowly moving in an upward motion.” He also said that Fluel-len’s body was moving in the direction toward where Wade was standing. Wade said that after he attempted to reach Fluellen the third time, he noticed that Fluellen had stopped moving and that his body went limp. When there was no longer any effort on Fluellen’s part, Wade said, he believed that that was when Fluellen had died. Wade did not make another attempt to approach Fluellen.
Hornady’s argument necessarily gives more weight to Dr. Gardner’s opinion that what Wade — and what other witnesses to the accident — saw was not voluntary movement on the part of Fluellen, but a contracting of the muscles into a “pugilistic” form. “It is rudimentary that if the matter at issue is not solely within the *246 knowledge of experts, then a lay witness’s testimony on the subject is competent for the jury’s consideration.” Ford Life Ins. Co. v. Smith, 369 So.2d 808, 809-10 (Ala.Civ.App.1979). It is within the province of the trial court, as the finder of fact in this case, to weigh Dr. Gardner’s opinion testimony regarding whether Fluellen was actually moving against the testimony of Wade, who observed Fluellen’s movements, saw his body “go limp,” and pinpointed that as the time he believed that Fluellen died. “Although a trial court is certainly free to believe the testimony of the expert witnesses presented by the parties, it is not bound by that testimony. Elite Transp. Servs. v. Humphreys, 690 So.2d 439, 441 (Ala.Civ.App.1997).” Caseco, LLC v. Dingman, 65 So.3d 909, 925 (Ala.Civ.App.2010). It is the duty of the trial court to reconcile conflicting testimony. Id.
Additionally, the record indicates that, without having the benefit of the witnesses’ statements, Dr. Gardner determined that Fluellen died as a result of coronary-artery insufficiency due to ather-osclerotic cardiovascular disease. She said that there was no way to tell if Fluellen had experienced an arrhythmia, because it leaves no sign, but, in her opinion, Fluel-len’s death was caused by a “coronary event.” When asked whether the coronary disease she discovered in Fluellen necessarily meant that he would have had a sudden death, Dr. Gardner responded: “It just means that he [was] at risk for sudden death.” Moreover, even if Fluellen had suffered some type of “coronary event,” Dr. Gardner acknowledged that, although it would have been possible that Fluellen may have survived such an event, she believed that “the fire would have prevented him from being saved.” She further testified that, if she had known of the witness reports, she would have concluded that Fluellen died as the result of thermal injuries.
As mentioned, both Dr. Gardner and Dr. Simmons said a flash fire would account for the lack of evidence of soot inhalation and that the absence of soot in Fluellen’s lungs did not mean that he necessarily died as the result of a heart attack or that he was dead before the collision. In a very hot flash fire, both doctors testified, the airways swell and prevent smoke or soot from entering the airway. Dr. Simmons said that, “based on discussions with the senior pathologist, we felt like [death caused by thermal injuries] was the most likely scenario given the eyewitness account that this gentleman had apparently been moving and responsive although somewhat confused after the initial wreck occurred but before the truck was engulfed in flames.”[2]
This is a difficult case. Based on the available evidence, we may never know what caused Fluellen to drive off the interstate into the median. However, it is the cause of Fluellen’s death — not the cause of the accident — that is key. Dr. Gardner and Dr. Simmons did not agree on the cause of Fluellen’s death, although in her testimony, as mentioned, Dr. Gardner wavered on the point. It is the duty of the trial court to weigh the evidence presented *247 and to make factual findings based on that evidence. The legislature has provided that, in workers’ compensation cases, the circuit court’s factual findings shall not be reversed if supported by substantial evidence. § 25-5-81(e), Ala.Code 1975.
In this case, the evidence in the record includes Wade’s description of the accident, including the collision and the explosions; the witnesses’ statements that Fluellen appeared to them to be alive immediately after the collision; the testimony of both Dr. -Simmons and Dr. Gardner regarding the type of injuries that can be suffered in a flash fire; Dr. Simmons’s ultimate conclusion that Fluellen died as a result of thermal injuries he suffered in the collision; and the amended death certificate reflecting thermal injuries as the cause of Fluellen’s death. From this evidence, the trial court could have determined that it was more likely than not that Fluellen died as a result of the explosion and resulting fire, and not from a “coronary event.” Accordingly, we conclude that the record contains substantial evidence in support of the trial court’s findings of fact.
Hornady argues that the trial court erred by awarding the dependants more than $3,000 for burial expenses. Pursuant to § 25-5-67, Ala. Code 1975, the maximum amount an employer is required to pay for burial expenses in a workers’ compensation case is $3,000. We note that the dependents made no argument to rebut this issue on appeal. Our research has revealed no authority that would allow the trial court to exceed that amount. Accordingly, we hold that the trial court erred in awarding the dependents “funeral expenses” of $6,887.
For the reasons set forth above, we reverse that portion of the judgment awarding the dependants burial expenses in excess of the maximum amount allowed by statute; we remand the cause for an award of burial expenses consistent with this opinion. The remainder of the judgment is affirmed.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
THOMPSON, P.J., and BRYAN and THOMAS, JJ., concur.
PITTMAN, J., dissents, with writing.
MOORE, J., recuses himself.

. This case was reassigned on September 18, 2012, to the judge who authored the opinion.

. Dr. Simmons’s statement that there were witnesses who saw Fluellen after the impact but before the flames is inconsistent with the witnesses’ statements that Fluellen and the cab of the truck were immediately engulfed in flames. However, such a misstatement is insufficient, in light of all the evidence, to totally disregard Dr. Simmons's opinion as to the cause of Fluellen’s death. In fact, because Wade’s testimony was that the cab was immediately engulfed in flames, even before the second explosion, the evidence tends to support the conclusion that Fluellen died of thermal injuries resulting from a flash fire more strongly than if Dr. Simmons's misstatement had been correct.